### CHICAGO, MILWAUKEE & ST. PAUL RY. CO., APPELLANT, *v.* MURRAY, COUNTY TREASURER, RESPONDENT.

(No. 4,225.)

(Submitted June 15, 1918. Decided July 11, 1918.)

[174 Pac. 704.]

*Taxation—Railroads—Electrification System—Constitution.*

Railroads — Electrification   System — Transmission   Line — By   Whom Taxable.
1. *Held*, that the transmission line by means of which electric current after having been transformed is carried to trolley wires, and owned and used by a transcontinental railway company in connection with the propulsion of its trains through electric motors, is no part of the roadbed, roadway, franchise, rails or rolling-stock, enumerated in section 16, Article XII, of the Constitution, as assessable by the state board of equalization, and is therefore properly assessable by the assessor of the county in which it is found.

Same—Trolley Wires—By Whom Taxable.
   2.   *Held,* further, that since that part of plaintiff railway's elec-
trification system consisting of a trolley line is a permanent struc-
ture affixed to the roadbed and extends continuously along the
railway line, with wires and other attachments connected to each
other and to the rails, it is assessable by the state board of equaliza-
tion and not by the assessor of any county.

Constitution—Nature of Instrument.
   3.   The state Constitution was by its framers intended to be a live
instrument, adaptable to the progress and changing conditions of
men and affairs.

*Appeal from District Court, Granite County; Geo. B. Win-
ston, Judge.*

ACTION by the Chicago, Milwaukee & St. Paul Railway Com-
pany, a corporation, against A. J. Murray, County Treasurer
of Granite County, Montana. Judgment for defendant, and
plaintiff appeals. Reversed and remanded.

*Messrs. Gunn, Rasch & Hall,* for Appellant, submitted a
brief; *Mr. M. S. Gunn* argued the cause orally.

That the assessment by a county assessor of that part of the
electrification system in his county, without reference to the
valuation of the entire system in connection with the railroad,
would not be a just valuation for the purpose of taxation as
required by the Constitution, and that a just valuation can only
be made on the basis of the valuation of the entire railroad
with the electrification system as an adjunct thereto is, we
think, supported by the decision in the case of *Cleveland etc.
R. R. Co.* v. *Backus,* 154 U. S. 439, 38 L. Ed. 1041, 14 Sup. Ct.
Rep. 1122.

We submit that the electrification system described in the
complaint is included in the category of property which the
state board of equalization is required to assess when section
16 of Article XII of the Constitution is construed according to
the spirit and intent of the section.  As said by Chief Justice
White in the opinion in the case of *Downes* v. *Bidwell,* 182 U. S.
244, 45 L. Ed. 1088, 21 Sup. Ct. Rep. 770, a Constitution should
be interpreted ''by the spirit which vivifies, and not by the
letter which killeth.''  (See, also, *State* v. *Sullivan,* 48 Mont.

320, 137 Pac. 392; *State* v. *Alderson,* 49 Mont. 387, Ann. Cas. 1916B, 39, 142 Pac. 210; *South Carolina* v. *United States,* 199 U. S. 437, 4 Ann. Cas. 737, 50 L. Ed. 261, 26 Sup. Ct. Rep. 110; *In re Debs,* 158 U. S. 564, 39 L. Ed. 1092, 15 Sup. Ct. Rep. 900; *Harshman* v. *Bates County,* 92 U. S. 569, 23 L. Ed. 747; *Elwell* v. *Comstock,* 99 Minn. 261, 9 Ann. Cas. 270, 7 L. R. A. (n. s.) 621, 109 N. W. 113, 698; *Jarrolt* v. *Moberly,* 103 U. S. 580, 26 L. Ed. 492.)

By the Constitution, rolling stock is required to be assessed by the state board. The electrification system furnishes the motive power for moving the train. It takes the place of steam and dispenses with the necessity of an engine and a tender to carry the coal. In other words, it has replaced the steam locomotive and it is a substitute for the rolling stock of a railroad to that extent. When, therefore, the Constitution is construed with reference to its spirit and intent, the electrification system should be treated and considered as a part of the rolling stock of the railroad. (*State* v. *Keating,* 53 Mont. 371, 163 Pac. 1156.)

In view of the fact that the Constitution of Montana does not require, as does the Constitution of California, that "land and the improvements thereon shall be separately assessed," and in view of the further fact that the former does not require, as does the latter, that all property subject to taxation, except that specially mentioned in section 10 of Article XII, shall be assessed locally, the rule of taxation of railroad property, adopted and followed in North Dakota, is the rule which should be applied in this state. (See *Chicago, M. & St. P. Ry. Co.* v. *Cass County,* 8 N. D. 18, 76 N. W. 239; *Minneapolis etc. Ry. Co.* v. *Oppegard,* 18 N. D. 1, 118 N. W. 830.) In the first case cited above, it was decided that the term "roadway" is synonymous with right of way, and included not only the right of way proper, but also station grounds, switching grounds, *etc.,* outside of the main right of way. In the case of *Minneapolis etc. Ry. Co.* v. *Oppegard,* cited above, it was decided that a telegraph line used in operating a railroad and also for com-

mercial purposes was not assessable by the state board.   In the opinion, however, it was said that "it will not be disputed that a telegraph line, used exclusively for the moving of trains and the dispatching of railroad business, is not assessable independently or separately from the railroad property."

The Revenue Act of Montana, adopted in 1891, was copied from the revenue law of California.   The fact that in California the Constitution required that lands and the improvements thereon should be assessed separately, and that all taxable property, except that mentioned in the section of the Constitution of that state, providing for the assessment of the franchise, roadway, roadbed, rails and rolling stock of railroads operated in more than one county, should be assessed locally, was apparently overlooked.   If the legislative assembly of Montana had recognized the distinctions between the Constitution of California and that of Montana pointed out, the rule of taxation of railroad property which prevails in North Dakota would undoubtedly have been adopted.   It is, we believe, beyond question that the framers of the Constitution intended by the use of the term "roadway" to include improvements which are situated on the roadway and are used solely for railroad purposes.   It is true that the term "rails" is found in section 10 of Article XII, but the reason for this is undoubtedly due to the fact that rails are regarded as trade fixtures and are not considered a part of the land.   (*Wiggins Ferry Co.* v. *Railroad Co.*, 142 U. S. 396, 35 L. Ed. 1055, 12 Sup. Ct. Rep. 188; *Wagner* v. *Cleveland & Toledo R. R. Co.*, 22 Ohio St. 563, 10 Am. Rep. 770; *Northern Central Ry. Co.* v. *Canton Co.*, 30 Md. 347; *Railway Co.* v. *Le Blanc*, 74 Miss. 626, 21 South. 748; *Skinner* v. *Ft. Wayne etc. Ry. Co.*, 99 Fed. 465; *Illinois Cent. R. R. Co.* v. *Hoskins*, 80 Miss. 730, 92 Am. St. Rep. 612, 32 South. 150; *Georgia R. R. & Banking Co.* v. *Haas*, 127 Ga. 187, 119 Am. St. Rep. 327, 56 S. E. 313.)

*Mr. S. C. Ford,* Attorney General, and *Mr. Frank Woody,* Assistant Attorney General, for Respondent, submitted a brief; *Mr. Woody* argued the cause orally.

MR. JUSTICE SANNER delivered the opinion of the court.

The motive power of the Chicago, Milwaukee & St. Paul Railway for a distance of 440 miles in this state, extending across several counties thereof, including the county of Granite, is electric; that is to say, its trains are drawn by electric motors instead of by steam engines. These motors receive the current necessary to actuate them from a trolley wire suspended directly over the center of each track. The current itself comes from remote plants not owned by the railway, and is conveyed by means of poles, towers and wires—the property of the supplying company—to seven of fourteen substations, where it is transformed and sent out along a transmission line to the other substations. The transmission line is located on the right of way, at a uniform distance of thirty-eight feet from the center of the main track, and it, together with all the substations, belongs to the railway company. From the substations the transformed current is carried to the trolley wires, which are hung from poles and brackets spaced about one hundred and fifty feet apart. These poles are set in the roadbed at a uniform distance of ten feet from the center line of the track, and they carry the necessary feeders, signal wires, message wires, wires for the power limit and indicating systems. To the same poles is attached a supplementary negative wire, which at certain points is connected with bonds attached to the rails, and the joints of all rails are bonded by a copper wire, so that, as the motor makes contact with the trolley wire, a circuit is completed through the rails, bonds and supplementary wire to the substations.

It is alleged in the complaint, which is by the railway company against the treasurer of Granite county, that this electrification system is used exclusively in the operation of its railroad, is necessary to the efficient and economical operation thereof, and constitutes a single continuous system; that the company made no return of it to the assessor of Granite county for the year 1917, but said assessor, notwithstanding, assessed 29.63 miles of the transmission line at a valuation of $2,830 per mile,

and 33.71 miles of the trolley line at $5,179 per mile, which assessment the company contested without avail before the county board of equalization, upon the ground that the property so assessed is within the jurisdiction of and assessable only by the state board of equalization, under the provisions of section 16, Article XII, of the state Constitution; that the taxes levied accordingly, amounting to $7,756.49, were paid under protest specifying. the same ground; that the state board of equalization in its assessment of the franchise, roadway, road-bed, rails, and rolling stock of the company for the year 1917 included in and valued as a part of the valuation placed upon such property the said electrification system hereinabove described. The prayer is for a recovery of the moneys so paid under protest. The treasurer filed a general demurrer, and, this being sustained, judgment of dismissal was entered, from which the railway company appeals.

But one question is presented, whether the county assessor [1] of Granite or the ·state board of equalization had the authority to assess the transmission line, or the trolley line, or both, as constituting the system of electrification; for it must be conceded — as the attorney general does concede — that both agencies could not act upon the same property, and the company cannot lawfully be subjected, as it has been, to a double imposition of the same tax upon the same property.

No solution of this question is entirely free from objection. Section 16 of Article XII of the Constitution provides: "All property shall be assessed in the manner prescribed by law except as is otherwise provided in this Constitution. The franchise, roadway, roadbed, rails and rolling stock of all railroads operated in more than one county in this state shall be assessed by the state board of equalization and the same shall be apportioned to the counties, cities, towns, townships and school districts in which such railroads are located, in proportion to the number of miles of railway, laid in such counties, cities, towns, townships and school districts." The meaning of this is perfectly clear, *viz.*, whatsoever is franchise, or roadway, or road-

bed, or rails, or rolling stock of a railroad operating in more than one county must be assessed by the state board of equalization; all other property, whether it be of a railroad or other owner, may or may not be similarly assessed, according to the provisions of statute in existence at any given time.   So far as it goes, this distinction may be said to indicate a policy to leave with the state board such railroad property as is continuous, as constitutes the necessary *corpus* of the railroad, as is not susceptible of a general valuation in sections.   But this indication is only so far as the language permits, for whatever the reason may have been, the restriction of the language to franchise, roadway, roadbed, rails and rolling stock must be taken as conclusive.   (*Northern Pac. Ry. Co.* v. *Brogan,* 52 Mont. 461, 158 Pac. 820.)   That it does not go so far as to comprehend a telegraph line placed on the right of way and used only for railroad purposes was decided in the *Brogan Case* just cited, and that it does not comprehend any other structures similarly placed follows of necessity if we are to adhere to that decision. We have carefully re-examined that decision, and we are satisfied with it as a correct application of the constitutional provision here involved to the facts of that case, and under it we are obliged to hold that the transmission line now in question is no more a part of the roadbed or roadway than the substations which it connects.   It was therefore properly assessable by the assessor of Granite, and not by the state board of equalization, unless it can be considered as part of the franchise, rails or rolling stock.   That it cannot be considered as part of the franchise or rails is conceded.   But there is contention that it properly belongs to rolling stock because the electrification system of which it is a part takes the place of the steam engine, which is rolling stock, as well as of cars—one of seven, it is said—necessary on steam railroads for the transportation of fuel.   We think this is untenable.   The electrification system does not take the place of steam engines or fuel cars, and would not be rolling stock if it did.   (*Ohio & M. Ry. Co.* v. *Weber,* 96 Ill. 443; *Flanagan* v. *Graham,* 42 Or. 403, 71 Pac. 137, 790.)   The place

of the steam engines is taken by the electric motors, which are rolling stock assessable as such, and the fuel cars remain available for other service, and still assessable as rolling stock. If any analogy is applicable—and analogies in such matters are sometimes misleading—it would rather regard the electrification as fuel, for the entire system is an elaborate contrivance to get to the electric motor the force in the form which will make the motor effective; and, as the steam engine is powerless without fuel, though still a steam engine, so the electric motor is dead without current, though it requires only that to make it powerful.

Considered separately, the trolley line is in a different situation. [2] Though no part of the franchise or rolling stock, it is a permanent structure affixed to the roadbed; it extends continuously across the electrified section of the railroad; it is so constructed that all its wires and other attachments are connected to each other and to the rails, so that when a motor is in contact, a circuit is formed, and thus the motor is enabled to function. We are therefore, neither in principle nor on the facts, aided by the Brogan decision in determining the status of this trolley line, but may, if so it appears, view it as part of the roadbed, if not by reason of its integration with the rails a part of them, and thus carry into effect the spirit as well as the letter of the constitutional provision here invoked. In the *Brogan Case* we held the term "roadway" as used in section 16 of Article XII, to be by legislative construction synonymous with "right of way," meaning by the latter term "the bare strip of ground upon which the roadbed, rails and other necessary appliances of the road are laid or erected, and not as including any of the improvements upon or annexed to that strip." This was because of statutory provisions (Laws 1891, pp. 73–80), requiring structures on the right of way to be separately assessed by the assessor of each county. No such provisions and no such construction confront us here. On the contrary, there stands the rule, then and now expressed by statute, that structures affixed to realty are part of the realty to

which they are affixed. The roadbed is that part of the right of way especially prepared for the emplacement of ties, rails and other necessary superstructures, and to which the ties, rails and other necessary superstructures are affixed. (Elliott on Railroads, 2d ed., sec. 5.) There seems to be no reason for the special mention of the roadbed in section 16 of Article XII, where the roadway, of which it is a part, and the rails, which form part of the superstructure upon it, are also mentioned, unless the roadbed was intended to embrace continuous structures permanently affixed to it, other than the rails. The same considerations which make it desirable that the rails and roadbed shall be assessed as a whole by the only agency which can so assesss them apply as well to any other continuous structure [3] affixed to the roadbed. We are to bear in mind that the framers of the Constitution intended it to be a live instrument adaptable to the progress and changing conditions of men and affairs (*State* v. *Keating,* 53 Mont. 371, 163 Pac. 1156); and, if by the language of section 16, Article XII, they have necessarily excluded the transmission line, we are still to apply the general purpose of the provision written by them, and thus include within its purview the trolley line and its attachments, because they are within and not without the scope of the language employed.

We realize that in a large sense the transmission line and the trolley line are parts of one electrification system, and that their separation into two taxation jurisdictions may not, at first blush, commend itself. So, also, may it be said that the substations are part of the same electrification system; but it is not questioned that these are within the jurisdiction of the local assessor. In point of fact, every piece of property owned and used in the operation of a railroad contributes to the usefulness, and to some extent enters into the value, of the railroad considered as a whole, yet by the Constitution some of these are regarded as primarily local in character, and therefore not within the jurisdiction of the state board. If as a result the command of the Constitution becomes inharmonious with a

strictly scientific view of what ought to be the rule, that is one of the many things which illustrate the price paid under all constitutional governments for the boon of certainty. But we are not required to increase this inharmony any more than we are authorized by any power vested in us to abolish it where it unquestionably exists.

It follows that so far as the trolley line is concerned, a cause of action was stated in the complaint, and the demurrer thereto should have been overruled. The judgment is therefore reversed and the cause remanded for further proceedings.

*Reversed and remanded.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.